IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HOUSTON POLICE OFFICERS' PENSION SYSTEM, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 08 CV _____ |
| STATE STREET BANK AND TRUST COMPANY and STATE STREET GLOBAL ADVISORS, INC. | § § § § § | |
| Defendants. | § § | JURY TRIAL DEMANDED |

## ORIGINAL COMPLAINT

Plaintiff Houston Police Officers' Pension System ("HPOPS") brings this action against Defendants State Street Bank and Trust Company ("SSB") and State Street Global Advisors, Inc. ("SSgA") (collectively "State Street") and alleges:

## PRELIMINARY STATEMENT

1.      This action arises out of State Street's deceptive, imprudent and incompetent performance of its obligations as a fiduciary and investment manager. State Street acted as a fiduciary and investment manager with respect to assets invested by HPOPS in a commodities strategy known as the Enhanced Dow Jones-AIG Commodities Strategy (the "Commodities Strategy"). HPOPS put up $72,000,000.00 as collateral for the Commodities Strategy to cover potential losses on commodities futures swaps. State Street held and invested $54,298,176.00 of the collateral funds. The collateral funds themselves were to be invested in new cash investments that would provide security through diversification, a modest return, and daily liquidity. Daily liquidity was

necessary in the event of a margin call for the Commodities Strategy. SSgA used its discretion as investment manager to invest the entire $54,298,176.00 into its Limited Duration Bond Fund. SSB served as the trustee of the Limited Duration Bond Fund.

2.     State Street represented to HPOPS that the Limited Duration Bond Fund would be invested in accordance with HPOPS' requirements in a high-quality, low-risk, well-diversified fixed income portfolio. The Limited Duration Bond Fund reportedly had a conservative rate-of-return objective to match or exceed the JP Morgan one-month US Dollar LIBOR Index by a mere 50 basis points (basis points where a basis point equals one-hundredth of one percent, or .01%). The Fund's stated objective was "to maximize income while *preserving capital* by investing in a *diversified portfolio of highly rated fixed income securities*," and State Street represented that the Fund would use "an *expanded universe of securities*" to include "repurchase agreements and United States Treasuries; debts of agencies of the United States Government; corporate debt; asset-backed securities, rated investment grade by Moody's and ERISA eligible; commercial mortgage backed securities, rated investment grade by Moody's and ERISA eligible; derivative securities; deposits and other debt instruments of US Banks; and bank commingled funds." Indeed, the Limited Duration Bond Fund's singular purpose was to serve as a slightly enhanced short-term cash vehicle for the collateral put up by HPOPS in the Commodities Strategy. HPOPS required daily liquidity so that cash would be readily available in the event of a margin call to cover the spread of commodity swaps. State Street failed to disclose that the Limited Duration Bond Fund itself would be invested almost solely in a single, residential mortgage sector, much of which was

2

subprime, or that the Limited Duration Bond Fund would itself be highly leveraged and illiquid.

3. Although the full dimensions of State Street's misconduct have not yet been revealed, HPOPS has learned that State Street – without advising HPOPS - radically misrepresented the investment strategy for the Limited Duration Bond Fund. For example, although State Street represented in or about August 2005 that only 5.3% of the Limited Duration Bond Fund was invested in mortgage securities and further represented that the Fund would, on average, be comprised of AAA-rated, low risk and well-diversified, core fixed income securities, HPOPS has since learned that as much as 94% of the Fund was invested in undisclosed positions in subprime, mortgage-related financial derivatives and that the Limited Duration Bond Fund was highly leveraged by using interest rate swaps and the ABX index swaps. State Street thereby concentrated the holdings of the Limited Duration Bond Fund in these risky assets and exposed the Limited Duration Bond Fund to an inappropriate level of risk for a slightly enhanced short-term cash vehicle intended to provide daily liquidity for HPOPS' Commodities Strategy. By investing HPOPS' collateral in the Limited Duration Bond Fund, State Street put HPOPS in an investment vehicle they knew or should have known was not suitable for HPOPS' needs either from a risk or liquidity standpoint.

4. State Street's approach produced catastrophic results during the summer of 2007 and the Limited Duration Bond Fund diverged dramatically from its benchmark. Although the Limited Duration Bond Fund was supposed to exceed the JP Morgan one-month US dollar LIBOR index by a mere 50 basis points and should have had a return of approximately 6.7% during the relevant time period, it instead incurred tens of millions in

losses.  Compounding the harm, State Street failed to disclose accurate information to HPOPS and instead provided untimely, incomplete and misleading information.

5.      Further, on information and belief, State Street engaged in blatant self-dealing by giving preferential treatment to other State Street-related entities, including other State Street-commingled funds that owned up to 38,856,819 units of the Limited Duration Bond Fund, in allowing them to get out of the Limited Duration Bond Fund before HPOPS and redeem their units in-kind for what appears to have been the most saleable of the securities held in the Fund; *i.e.* the 2004 and 2005 "vintage" year mortgage securities that actually held equity.  Instead, HPOPS was left with 88% of the ownership of units in the Fund that consisted of illiquid, odd-lot subprime mortgage securities with little or no equity.

6.      As a result of State Street's breaches of fiduciary duty, breaches of contract, fraudulent misrepresentations and omissions, violations of the Texas Securities Act and other acts of misconduct, HPOPS lost tens of millions of dollars.

## THE PARTIES

7.      Plaintiff Houston Police Officers' Pension System ("HPOPS") is a governmental retirement plan organized under Article 6243g-4 of the Texas Revised Civil Statutes for the Police Officers of the City of Houston, Texas.  Tex.Rev.Civ.Stat. art. 6243g-4 (Vernon Supp. 2007).  HPOPS has its principal place of business at 602 Sawyer, Suite 300, Houston, Texas 77007.

8.      SSB, which does business as State Street Bank and Trust Company, is a wholly-owned subsidiary of State Street Corporation, a publicly registered financial holding company.  SSB is a bank organized under the laws of the Commonwealth of

4

Massachusetts with its principal place of business in Boston, Massachusetts. Further, SSB is the trustee, custodian and record-keeper of the Limited Duration Bond Fund at issue in this Complaint and has "exclusive management and control of the Trust" which established the Limited Duration Bond Fund.

9.     SSgA is a Delaware corporation and has its principal place of business in Boston, Massachusetts. SSgA is a wholly-owned subsidiary of State Street Corporation. SSgA acted as Investment Manager for certain HPOPS funds and specifically directed that such funds should be invested in the Limited Duration Bond Fund. SSgA also served as the Investment Manager of the Limited Duration Bond Fund and directed the investments of the bond fund.

## JURISDICTION AND VENUE

10.     This court has jurisdiction over this lawsuit because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000.

11.     A substantial part of the events or omissions giving rise to this claim occurred in this district. Defendants purposefully availed themselves of the benefits of doing business in the State of Texas. Venue is therefore proper in this district pursuant to 28 U.S.C. § 1391(a)(2). Moreover, Section 13 of the Investment Management Agreement governing the parties' relationship provides that venue "shall be exclusively in the state or federal courts located in Houston, Harris County, Texas."

## FACTUAL ALLEGATIONS

## I. The Inducement: State Street Induces the Sale of its Services as Investment Manager for a Commodities Strategy with Collateral Invested in a Well-Diversified, High-Quality Limited Duration Bond Fund

12.     Plaintiff HPOPS was established in 1947 by the Texas Legislature to provide retirement, death, and disability benefits to its approximately 7,328 members – active and retired Police Officers of the City of Houston, Texas and certain of their surviving family members.  HPOPS is governed by Texas state law under Article 16, § 67(a) and (c) of the Texas Constitution, Article 6243g-4 of the Texas Revised Civil Statutes, entitled "Police Officers' Pension System in Certain Municipalities," and contracts pursuant to Section 27 thereof.  Under the Texas statute, the Board of Trustees ("the Trustees") of the Pension System is authorized to control or manage the investment of pension funds and may "employ professional investment managers and advisors to manage, or advise, the board regarding the management and investment of, the fund." TEX. R. CIV. STAT. art. 6243g-4, § 5(c) (Vernon Supp. 2004); *see also id.* at § 10. HPOPS is also subject to the Texas Government Code, Section 802, *et. seq.*, governing public retirement systems.  While HPOPS is not subject to the Employees' Retirement Income Security Act of 1974, as amended ("ERISA"), many of the state law provisions governing HPOPS are analogous to ERISA's statutory provisions.

13.     In July 2005, the Trustees authorized HPOPS' Chief Investment Officer, Pat Franey, to consider investments in a Treasury Inflation Protected Securities (TIPS) and a commodities futures strategy.  HPOPS began evaluating presentations made from

various investment management firms regarding their commodities investment capabilities.

14      On or about August 30, 2005, Eric Roberts, a principal of the Public Funds Group of SSgA, sent a Power Point presentation to HPOPS' Franey regarding State Street's TIPS and commodities futures strategies' capabilities.      Regarding their Commodities Strategy, Roberts represented that SSgA was very experienced with commodities investing, claiming that it was the "#1 Passive International index fund manager" with a "nine year track record" and "low cost trading" and that it was "currently managing $18b in equity and commodity futures and swaps." SSgA purported to be the world's largest institutional asset manager.  Further, SSB allegedly has $1.9 Trillion of assets under management.

15.      Generally, in a commodities strategy using a swap, the investor enters into an agreement with the swap provider wherein the investor and the swap provider agree to exchange certain amounts on pre-specified settlement dates based upon changes in the commodities markets.  As part of the swap agreement, the investor is required to deposit cash or securities into a margin account with the swap provider, generally 5-10 percent of the notional value of the swap.  If the investor provides the minimum required margin, then the investment can be significantly leveraged.  Alternatively, if the investor does not desire a leveraged strategy, as HPOPS decided to do in this case, then additional funds up to the full notional value of the swap are deposited with an investment manager.  In HPOPS' case here, seventy-five percent (75%) of the required funds were held by State Street for investment in the Limited Duration Bond Fund and twenty-five percent (25%) were held by AIG Financial Products Corp. ("AIG"), the swap provider.  This effectively

7

produced two accounts: a margin account with the swap provider and a collateral account with the investment manager. On each settlement date, the swap provider – whose twenty-five percent (25%) margin account was required to be maintained at all times -- was either to deposit additional funds into the State Street collateral account or else withdraw funds from the State Street collateral account depending on the variation in the commodities markets. Thus, a primary objective was to invest the State Street collateral account funds in a diversified manner that protects principal while allowing a liquid, conservative rate-of-return so that these additional funds would be available on a daily basis to replenish the twenty-five percent (25%) margin account held by AIG.

16. One of the commodities strategies offered by State Street was the "Enhanced DJ-AIG Strategy" referred to herein as the Commodities Strategy. State Street represented in the August 2005 presentation that the Commodities Strategy would be comprised of three separate funds: (1) the Enhanced DJ-AIG Total Return Fund, in which SSgA would provide for "commodity exposure through index futures, underlying commodity futures and swaps," (2) the Limited Duration Bond Fund as the short term cash vehicle in which the collateral beyond the margin requirement for the commodities investments would be held, described by SSgA as a fund that "seeks to match or exceed the returns of the one-month US Dollar LIBOR Index by 50 bps," has investments of "Average Quality AA," and a "Historical Effective Duration of 0.25 [years]," and (3) SSgA Money Market Fund utilized for margin variation. Importantly, SSgA represented that the Commodities Strategy in the DJ-AIG Total Return Fund would be "unleveraged - - residual cash would be invested in high quality money market securities or pooled

8

funds." State Street further touted that the investment strategy associated with the Limited Duration Bond Fund provided for "daily liquidity."

17.     The August 2005 presentation also included a page entitled "Limited Duration Bond Fund – Portfolio Characteristics" dated as of June 30, 2005. State Street claimed that the composition of the Bond Fund had an "average quality of AAA," effective duration of 0.14 [years], and a 38.1 basis points yield over the one month LIBOR. The presentation broke down the quality of securities held in the Limited Duration Bond Fund as 76% AAA, 20.8% AA, 1.3% A and only 1.9% BBB. It further represented that the Fund was composed of the following sectors by market value: 75.8% in asset-backed securities; 11.1% in commercial mortgage-backed securities; 5.7% in cash; 2.0% in agency securities; and only 5.3% in mortgage-backed securities. "Asset-backed" securities generally do not include mortgage-backed securities. This is especially the case where, as here, SSgA presented mortgage-backed securities in its own category with only 5.3% of the Limited Duration Bond Fund and asset-backed securities were separately identified.

18.     The Limited Duration Bond Fund was formed by SSB under the State Street Bank and Trust Company Investment Funds for Tax Exempt Retirement Plans Declaration of Trust ("the Trust"), dated February 21, 1991, most recently amended and restated on August 15, 2005. SSB is trustee, custodian and record-keeper of the Limited Duration Bond Fund and has exclusive management and control of the Trust. SSgA is the Limited Duration Bond Fund's investment manager. SSB as trustee, pursuant to the Declaration of Trust, issued an Amended Fund Declaration for the Limited Duration Bond Fund effective as of October 1, 2005. Pursuant to the Amended Fund Declaration,

SSB as trustee of the Limited Duration Bond Fund agreed to hold funds received by it as trustee in accordance with the Declaration of Trust and Amended Fund Declaration for the benefit of the Limited Duration Bond Fund's beneficiaries – the owner of units in the Fund. SSB issued units of the Limited Duration Bond Fund to HPOPS and HPOPS thereby became a beneficiary of the Trust and/or Limited Duration Bond Fund. Under this arrangement, both SSB and SSgA owe HPOPS fiduciary duties with respect to investments in the bond fund.

## II. The Investment Management Agreement – State Street Accepts the Highest Fiduciary Duties

19. Relying on State Street's representations, on or about September 13, 2005, the Trustees selected SSgA as the investment manager for HPOPS' commodities futures and TIPS strategies. During negotiations for the Investment Management Agreement, the Trustees initially elected to proceed first with the TIPS strategy and to wait for a short period before proceeding with the Commodities Strategy. On or about December 6, 2005, the Board of Trustees of HPOPS ("Trustees") and SSgA executed an Investment Management Agreement ("IMA"), pursuant to which the Trustees appointed and retained SSgA as investment manager with respect to the investment and management of account assets to be directed in accordance with the TIPS strategy.

20. On or about April 24, 2006, Pat Franey of HPOPS emailed Christopher Douglass and Donna Watkins of SSgA that HPOPS was ready to move forward on the previously discussed Commodities Strategy. An email from Pat Franey to Donna Watkins of June 8, 2006 notified SSgA that HPOPS intended to average in over the next twelve months, starting in July 2006, $6 million per month in the Commodities Strategy, for a total investment of $72 million.

21.     On or about June 16, 2006, HPOPS and SSgA executed the First Amendment to the IMA. The First Amendment to the IMA added provisions relating to the Commodities Strategy previously presented by SSgA. The IMA and the Amendment to the IMA are attached hereto as Exhibit A.[1]  As amended, the IMA is referred to herein as the "Amended IMA."

22.     Under the Amended IMA, SSgA represented and covenanted that "it will be acting as a fiduciary with respect to the Account Assets and that it is subject to the applicable fiduciary standards of conduct imposed by federal and Texas state law, and the Code of Ethics of the Houston Police Officers' Pension System."  More specifically, SSgA agreed to exercise the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with matters of the same type would use in the conduct of an enterprise with a like character and with like aims."  IMA at § 5.c.  Likewise, pursuant to HPOPS' Code of Ethics, which was adopted in toto by SSgA, SSgA agreed that:

> In the performance of these duties, all trustees, employees, consultants, vendors and other fiduciaries of the System [which by definition would include State Street] **are subject to the "prudent expert" rule which requires that they exercise their duties with the care, skill, prudence, and diligence under the prevailing circumstances that a prudent person acting in a like capacity and familiar with matters of the type would use in the conduct of an enterprise with like character and like aims**. Further, all fiduciaries of the System shall maintain high ethical and moral character both professionally and personally, such that the conduct of all fiduciaries shall not reflect negatively upon the Board of Trustees or the System.

Code of Ethics at § 602.02.

---

[1]  On or about April 20, 2007, because of rising fees in the TIPS account, HPOPS closed its TIPS portfolio with SSgA. The parties continued to operate under the IMA, as amended, with respect to HPOPS' investment in the SSgA commodities futures strategy.

23.     HPOPS had no control over the investment process or investment decisions of the Limited Duration Bond Fund. Further, under the Amended IMA, SSgA had discretion to manage the assets held in the collateral account to meet HPOPS' investment objectives, including the collateral invested in the Limited Duration Bond Fund. This discretion, however, was to be exercised subject to "the terms and conditions of [the IMA], [HPOPS'] Code of Ethics, and in accordance with the investment guidelines established by the [HPOPS'] Trustees (as set forth in the Statement of Policy Guidelines and Investment Objectives of the Fund)." IMA at § 5. The Code of Ethics (Exhibit C to IMA) and the Statement of Policy Guidelines and Investment Objectives of the Fund (Exhibit B to IMA) were all attached to and specifically made a part of the IMA.

24.     Therefore, in addition to being subject to a "Prudent Expert" rule, SSgA also specifically agreed that "[f]ixed income investments should provide a positive cash flow to the System, dampen the volatility of the System, and provide positive real returns even on a short time horizon." HPOPS Investment Policy at § 407.04.A.   *Id.* Importantly, SSgA also agreed that "*[n]o more than 25% of the portfolio at market value shall be invested in any one single industry sector*." *Id.* at § 407.04.E (emphasis added).     As discussed further below, State Street recklessly violated each of these policies and breached its contractual and fiduciary duties in doing so.

25.     Under the Commodities Strategy, HPOPS was also required to execute an International Swap Dealers Association, Inc. Agreement or ISDA with the counterparty for the commodities trading, AIG. Pursuant to that agreement, AIG became the swap counterparty for the commodities futures swaps. As with any commodities futures

12

strategy, HPOPS was required to put up collateral for the margin account associated with the commodities futures swaps. Pursuant to the ISDA, HPOPS, State Street and AIG agreed that 25% of the HPOPS' collateral would be sent immediately to AIG to be invested in AIG's general corporate cash and that the remaining 75% of collateral funds would be invested by SSgA in a secure, well-diversified portfolio of low-duration, fixed income securities.

26.     Notably, HPOPS did not desire to leverage the Commodities Strategy. Therefore, 100% of the notional value of the swaps was put up in cash as collateral for the swaps. In other words, for every dollar pledged to buy commodities futures swaps, the parties agreed that there would be a corresponding dollar in a cash or cash equivalent fund to cover any loss. If HPOPS lost money on the commodities swaps, the parties agreed that any loss would come first out of the SSgA account. Therefore, it was well understood that there was a need for great liquidity in the SSgA short-term-cash-vehicle account holding the cash collateral – the Limited Duration Bond Fund.

27.     As set forth in the Amended IMA, the parties agreed that HPOPS would invest six-million dollars ($6,000,000) every month for 12 months for a total investment in the Commodities Strategy of seventy-two million dollars ($72,000,000).    Thus, HPOPS invested $72,000,000 as collateral to participate in commodities futures swaps. Each month from July 2006 through May 2007, HPOPS sent $6,000,000 to their trust company, Northern Trust Company, with instructions to wire the funds to SSgA.    As agreed, each month, State Street immediately sent 25% of the cash collateral to AIG. The remaining 75% was invested by SSgA pursuant to the Amended IMA.    Under the Amended IMA, SSgA represented that the collateral would be invested in "money market

funds and other cash management funds including, but not limited to, money market mutual funds for which an affiliate of the Manager acts as an investment advisor or other funds for which the Manager serves as investment advisors."   Amended IMA at § 1. Exercising its sole discretion, SSgA placed HPOPS' cash collateral in the Limited Duration Bond Fund, of which SSgA served as investment manager and SSB was trustee and custodian.

28.    As of May 31, 2007, HPOPS' investment in the Commodities Strategy totaled $74,672,819, according to the SSgA Account Summary.  SSgA invested 75% of HPOPS' cash collateral in the Limited Duration Bond Fund, purchasing 4,719,665.291 units of the Fund with a market value as of May 31, 2007 of $56,272,569.26.

### III. State Street's Representations:  State Street Represented that the Limited Duration Bond Fund Would Consist of a High Quality, Well Diversified, Fixed Income Securities Allocation Providing for Daily Liquidity

29.    In inducing HPOPS to invest in the Commodities Strategy with State Street, State Street represented to HPOPS, and in particular to Pat Franey, Chief Investment Officer at HPOPS, that the cash collateral for the strategy would be placed in very conservative funds investing in AAA-rated, near zero duration, well-diversified, fixed income securities.  State Street further represented that the collateral would be conservatively invested allowing for daily liquidity because its intended purpose was to provide cash in the event of a margin call to cover the spread of commodity swaps.

30.    After securing HPOPS' investment in State Street's commodities futures strategy, State Street did not send any information to HPOPS, nor did it make any representations of any kind, either verbally or in writing, about the composition or performance of the Limited Duration Bond Fund until the late spring/early summer of

2007. Indeed, in May 2007, HPOPS became worried about the lack of information, and Pat Franey asked State Street for account reconciliations. State Street, however, provided no specific account information about the nature or amount of specific investments until July 2007.

31.     On or about May 11, 2007, Pat Franey sent Craig DeGiacomo of SSgA an email to double check on the liquidity of HPOPS' investments and asked how long it would take to obtain a substantial amount from the commodities portfolio. DeGiacomo responded: "You could get all of the money (around $68m) with one day's notice – just our normal notification." He explained that if the trade date is Monday, HPOPS could get its cash on Tuesday. This representation, like State Street's previous promises of daily liquidity, proved to be false.

32.     In the early summer of 2007, HPOPS became concerned when the portfolio account summary first reflected significant losses in the overall Commodities Strategy. Indeed, on July 18, 2007, SSgA sent the final performance numbers for HPOPS' commodities portfolio for the month of June. Notably, this account did not specifically show the performance of the Limited Duration Bond Fund. Rather it only showed that, as of June 30, 2007, the entire account, which had been $74,672,819 as of May 31, 2007, had depreciated by $1.5 million for an ending balance of $73,135,502. HPOPS deciphered that the depreciation was due, not to the performance of the commodities swaps themselves, but to State Street's investments of the collateral in the supposedly conservative, high quality, diversified Limited Duration Bond Fund. Because the Commodities Strategy lost 2% in June and the commodities index was down only

1.4%, HPOPS suspected, but was not sure, that the loss was due to the negative performance of the Limited Duration Bond Fund of 60 basis points.

33.     Accordingly, Pat Franey requested on or about July 23, 2007 copies of all monthly statements of the account in the Limited Duration Bond Fund since inception. Holly Barclay of State Street informed him that there were no such monthly performance reports for the Limited Duration Bond Fund. Without such reports, Franey was not able to monitor how HPOPS' cash collateral was specifically being invested. However, Barclay did provide an excel spreadsheet showing the return streams for the Limited Duration Bond Fund since HPOPS' inception in June 2006 and an Appraisal Report showing HPOPS' market value as of month's end since inception. Those reports reflected that, as of June 2007, performance of the fund since inception was approximately 2.14% versus the targeted benchmark of 2.94%. HPOPS was misled, once again, about the true condition of the Limited Duration Bond Fund.

34.     On or about July 23, 2007, Franey requested from Holly Barclay a "prospectus"[2] and annual report for the Limited Duration Bond Fund. Incredibly, those materials continued to represent the Fund as an enhanced cash vehicle invested in high quality, well-diversified fixed income securities with a conservative benchmark to match or exceed the JP Morgan one-month US Dollar LIBOR Index. As reported in the prospectus, State Street described the Limited Duration Bond Fund's strategy as seeking "to maximize income while *preserving capital* by investing in a *diversified portfolio of highly rated fixed income securities.* The Strategy seeks to match or exceed the returns of the JP Morgan one-month US Dollar LIBOR Index over trailing one-year periods." It

---

[2]   On or about July 23, 2007, State Street sent Franey a document that will be referenced herein as a "prospectus" entitled "Limited Duration Bond Strategy" dated June 30, 2007.

16

further described the fund as utilizing "an ***expanded universe of securities*** that goes beyond typical money markets including: Treasuries, agencies, collateralized mortgage obligations, adjustable rate mortgages, corporate bonds, asset backed securities, futures, options, and swaps." SSgA represented that "all securities purchased for the fund have a minimum investment grade rating by either Standard and Poor's or Moody's Investment Service" and a maximum effective duration of one year. The prospectus further represented that the Limited Duration Bond Fund strategy has "better sector diversification, higher average credit quality, and higher expected returns" than the typical 2A-7 regulated money market portfolio.

35.      State Street, through Holly Barclay, also sent to Pat Franey on or about July 23, 2007, financial statements for the Limited Duration Bond Fund issued by SSB, as audited by Price WaterhouseCoopers, dated December 31, 2006.      The report represented the fund's net assets as of December 31, 2006 to be $1,639,638,308 with a net realized gain for the year of $90,385,558. The report also enclosed a schedule of investments that reflected a diversification of investments as follows: 1.1% in commercial mortgage-backed securities, 0.7% in credit card asset-backed securities; 32.2% in home equity asset-backed securities; 0.2% in municipal securities; 41.6% in other asset-backed securities; 0.1% in student loan asset-backed securities; 8.4% in WL Collateral collateralized mortgage obligations; and 15.7% in State Street Bank & Trust Company Collective Investment Funds. HPOPS would soon thereafter become very concerned about the dramatic increase in residential mortgage investments. The true story, however, was yet to be revealed by State Street. HPOPS would later learn that

even the higher percentage in this report was false and the actual percentage of holdings in subprime residential mortgage-backed securities was much, much higher.

36.     On or about July 24, 2007, State Street sent the Amended Fund Declaration for the Limited Duration Bond Non-Lending Fund, dated October 1, 2005 ("Fund Declaration"). The Fund Declaration provided that the objective of the Limited Duration Bond Fund was to "match or exceed the total rate of return of the J.P. Morgan one month U.S. Dollar Libor Index." The Fund Declaration again represented that the Fund would be well-diversified and would achieve its objective by investments in, including but not limited to, repurchase agreements and United States Treasuries; debts of agencies of the United States Government; corporate debt; asset-backed securities, rated investment grade by Moody's and ERISA eligible; commercial mortgage backed securities, rated investment grade by Moody's and ERISA eligible; derivative securities; deposits and other debt instruments of US Banks; and bank commingled funds.

37.     State Street in fact continued to tout the Fund as well-diversified and failed to disclose the true extent of its exposure in the subprime residential mortgage market throughout the summer and early fall of 2007. Indeed, as late as August 28, 2007 and September 11, 2007, State Street's Power Point presentations to HPOPS represented that the holdings in the Fund as of July 31, 2007 included 28.7% of securities in the government sector, 54.1% in asset-backed securities, 1.85% in commercial mortgage backed securities and only 15.35% in mortgage-related investments.     SSgA representatives later admitted at these very meetings that these disclosures were in fact misleading.

**IV. The Truth Is Revealed: State Street Breached Its Fiduciary Duties by
Concentrating the Limited Duration Bond Fund's Holdings in Leveraged, Subprime
Residential Mortgage-Backed Securities and Derivatives**

38.     HPOPS has since learned that, without advising HPOPS or otherwise

correcting their disclosures regarding the Limited Duration Bond Fund, State Street

dramatically misrepresented the investment objectives and strategy of the Limited

Duration Bond Fund.    Rather than investing in high-quality, well-diversified fixed

income securities as State Street had represented, State Street had in fact invested the

fund almost exclusively in subprime, residential mortgage-backed securities and

derivative investments.   Indeed, during 2007, State Street purchased a long position on

the BBB ABX Index, an investment in derivative instruments backed by subprime

mortgages that was rated below investment grade.    This investment was in direct

contravention of State Street's representations that the Fund would not be significantly

exposed to non-investment grade investments.   Inexplicably, ABX Index swaps exposed

the fund to the volatility of the subprime mortgage market at precisely the time when it

was publicly reported that defaults of subprime mortgages were skyrocketing and

numerous subprime lenders were facing insolvency.    To make matters worse, HPOPS

learned that the Limited Duration Bond Fund, which was to serve as the cash account

subject to daily liquidity for the completely unleveraged Commodities Strategy, was itself

highly leveraged.

39.     State Street first revealed that the Limited Duration Bond Fund had been

affected by the subprime, residential mortgage crisis when Craig DeGiacomo emailed Pat

Franey on or about July 20, 2007, that he was "working on a letter that I will send to you

explaining the underperformance [of the commodities portfolio] as a result of the

19

Subprime issue." State Street, however, failed to disclose the true extent of the problem and continued to misrepresent the actual composition of the Limited Duration Bond Fund. Indeed, around this point, HPOPS was desperately trying to get accurate information about the fund's asset allocation so that it could determine if any steps needed to be taken to protect its investment – steps that State Street should have already taken pursuant to its fiduciary obligations as investment manager to HPOPS and the Limited Duration Bond Fund and as trustee of the Limited Duration Bond Fund.

40. On or about July 26, 2007, State Street sent an email entitled "Update on the Subprime Market and SSgA's Fixed Income Strategies," in which State Street disclosed as follows:

> [P]roblems in the subprime mortgage market continue to unsettle credit markets. Moody's and Standard and Poor's recently downgraded some securities involving subprime debt and placed other securities on credit watch. This comes amid a continuing wave of mortgage payment delinquencies and foreclosures and could disturb credit markets for some months to come. Already we have seen pricing on certain tranches of each of the three ABX Indexes, which are linked to pools of subprime mortgage debt, reach historic lows. These events are impacting performance in some of our active fixed income portfolios in which you are invested directly or indirectly.

This was the first time HPOPS had ever learned that its collateral was being used to purchase swaps of the ABX Index. State Street, however, assured its clients, including HPOPS, that the crisis was "driven more by liquidity and leverage issues" rather than long term fundamentals and represented that it was seeking to reduce risk by taking advantage of liquidity in the market where it exists. State Street, in its fiduciary capacities, made no recommendation to HPOPS to protect its investment. Instead, State Street continued to mask the extent of the devastating losses.

41. Upon receiving these emails, Pat Franey began asking questions of Craig DeGiacomo in late July/early August 2007 regarding the composition of the portfolio to determine how much was invested in the subprime market. Franey desperately needed this information so that he could evaluate State Street's continuing investment in the Limited Duration Bond Fund. When Franey could not get a straight answer, he had HPOPS independent consultant, Jerry Woodham of Hammond Associates, make calls to SSgA on HPOPS' behalf to see if he could determine the exact amount of subprime holdings. In or about early August 2007, HPOPS learned for the first time, through its consultant, that in reality the Limited Duration Bond Fund had substantial holdings in subprime mortgage-backed securities. When confronted by HPOPS, State Street representatives would confirm months later that indeed it had subjected almost the entirety of HPOPS' collateral held at State Street to the volatile subprime mortgage crisis.

42. In the first week of August 2007, Craig DeGiacomo sent a letter to Pat Franey purporting to "update" SSgA on the Subprime issues. DeGiacomo revealed that the Limited Duration Bond Fund was "most notably" affected by the subprime mortgage crisis and that it had "experienced significant negative performance due to its exposure to ABX Indices," which represent "swaps whose returns are derived from underlying credit default swaps of the 20 representative subprime mortgage securitizations issued in the United States over a 6 month timeframe." DeGiacomo continued: "The Limited Duration Bond Strategy experienced negative performance in the second quarter of 2007 as a result of technical pressures (hedge fund selling) and spread widening in BBB-rated securities secured by subprime mortgages. The Limited Duration Bond Strategy experienced even more pronounced negative performance in the second quarter of 2007 which continued in

July as spread widening moved up the capital structure to AAA and AA-rated securities by subprime mortgages." He further represented that the DJ-AIG Commodities Futures Strategy has experienced "significant negative performance primarily due to the performance of the underlying collateral pool which is invested in the Limited Duration Bond Strategy." SSgA concluded the letter by reassuring HPOPS that State Street was reducing risk in the Limited Duration Bond Fund by reducing a significant portion of its BBB-rated securities and selling a significant amount of AAA-rated cash positions. Once again, State Street's representations were flatly false. In fact, SSgA's James Hopkins later admitted that State Street was selling securities only to fund liquidations. Any decrease in risk, therefore, was simply a by-product of this forced selling, not some stated strategy to reduce risk.

43. On August 28, 2007, Craig DeGiacomo, James D. Hopkins, and John A. Tucker of SSgA made a presentation to HPOPS regarding the Limited Duration Bond Fund. The Power Point slides continued to represent the Limited Duration Bond Fund as well-diversified and in high quality fixed income securities with the conservative benchmark of matching or exceeding the returns of the one month US dollar LIBOR index. The presentation represented that as of July 31, 2007, the fund had an average quality of AA2 and a 7.87% yield. Indeed, the breakdown of holdings by sector reflected only 15.4% of the holdings in mortgage securities and 54.15% in asset-backed securities. Once again, SSgA did not provide a break-down as to what kind of asset-backed securities that sector included.

44. However, during the August 28, 2007 meeting, SSgA's James Hopkins acknowledged to HPOPS representatives Pat Franey, John Lawson, and Stacy Ables that

the sector allocations reflected in the presentation were misleading. Indeed, State Street admitted that the percentage of holdings in residential mortgage-backed securities was as high as 85%. When Pat Franey asked why the portfolio had not been diversified as previously represented, Hopkins admitted for the first time that State Street had never had an intention of diversifying outside of the mortgage sector. Hopkins also claimed that the high percentage of investments in residential mortgage backed securities was "core to their strategy." This, of course, had never before been disclosed to HPOPS and was entirely contrary to (i) State Street's presentation in August 2005 that represented that the Fund would hold only 5.3% in mortgage-backed securities and would be well-diversified; (ii) the PriceWaterhouseCoopers Audit Report (sent to HPOPS in July 2007) which reflected the Fund's holdings as of December 31, 2006 as 32.2% in home equity asset-backed securities; (iii) both the Fund Declaration and the Prospectus for the Limited Duration Bond Fund (sent to HPOPS in July 2007) which represented that the Fund had been and would continue to be a *"diversified portfolio of highly rated fixed income securities"*; and (iv) the August 28, 2007 and September 11, 2007 Power Point presentations which reflected a sector diversification of only 15.4% in mortgages.

45. Further, at the meeting on or about August 28, 2007, State Street discussed its recent disclosure that the Limited Duration Bond Fund had invested in the BBB tranche of the ABX Index. SSgA described the ABX Index as a "20-name index of recently issued subprime residential mortgage securities that is tranched into five rating categories (*i.e.*, AAA to BBB)." In neither the August 2005 presentation, the Limited Duration Bond Fund Prospectus, the Fund Declaration, or any other disclosures previously made to HPOPS had State Street revealed that it would invest in the ABX

23

Index. ABX contracts are commonly used by investors to speculate on or to hedge against the risk that the underling mortgage securities are not repaid as expected. A decline in the ABX Index signifies investor sentiment that subprime mortgage holders will suffer increased financial losses from those investments. These investments do not fit the profile of a high-quality, well diversified fixed income securities fund.

46.     On September 11, 2007, SSgA again met with HPOPS to make a presentation to its Board of Trustee. Craig DeGiacomo, Paul Greff and John Tucker of SSgA continued to tout State Street as the "Leading Provider of Financial Services to Institutional Investors." Despite its verbal acknowledgment of the misleading nature of the sector allocation in the August 28, 2007 presentation, State Street again represented that the holdings in the Fund as of July 31, 2007 included 28.7% of securities in the government sector, 54.1% in asset-backed securities, 1.85% in commercial mortgage backed securities, and only 15.35% in mortgages.

47.     State Street should have known it was embarking on a reckless investment strategy for what was supposed to be a short-term cash vehicle. The imminent collapse of the subprime lending industry was widely documented. In December 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market. *See* Ron Nixon, *Study Predicts Foreclosure For 1 in 5 Subprime Loans*, New York Times, December 20, 2006. Shortly thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, resulting in SEC and FDIC inquiries and several bankruptcy filings. In this financial environment, State Street exposed HPOPS to unacceptable risk by investing cash equivalent funds into the Limited Duration Bond Fund and by mismanaging the fund to invest its assets not in

accordance with its stated objectives. SSgA breached its fiduciary duties to HPOPS assured under the IMA and its fiduciary duty to HPOPS as a unit holder in the Limited Duration Bond Fund. SSB, as trustee of the Limited Duration Bond Fund, breached its fiduciary duty to HPOPS by providing misleading information on the fund and by mismanagement and lack of oversight of the fund's investments.

48. The high concentration of subprime mortgage investments in the Limited Duration Bond Fund was again confirmed on or about September 19, 2007, when Craig DeGiacomo of SSgA sent to Pat Franey an email with a retracement analysis for the entire fund, which showed that HPOPS was left holding 89.5% of the entire fund by that point.[3] The analysis confirmed that, in spite of State Street's previous representations, the vast majority of the investments in the Fund were in the subprime mortgage market. The Fund had a total market value of $31,955,000 as of September 14, 2007, with 72.37% reported to be in subprime mortgage securities. The remaining holdings in CDO-ABS, commercial MBS, Home Equity, Mortgage Aussie, and Prime MBS, were also mortgage-concentrated, other than a small percentage of cash. On October 1, 2007, Robert Pickett of SSgA sent Franey a spreadsheet reflecting the approximately 89.5% weighting of the Fund's assets to show HPOPS' "slice" of the Fund. HPOPS' holdings as of September 14, 2007 had a market value of just $28,792,000, of which $20,699,000 or 72% was reported to be in subprime residential mortgage backed securities. However, an accurate picture of the Limited Duration Bond Fund was yet to be released.

49. It was in October 2007 that State Street sent Pat Franey a spreadsheet which confirmed **for the first time** that, as of July 31, 2007, *94%* of the Fund's holdings

---

[3] Prior to this point, State Street failed to tell HPOPS that there had been a mass exodus from the Limited Duration Bond Fund -- primarily from distributions to State Street-related entities. See §§ 52-61 of Complaint.

were, not just in mortgage-backed securities, but in *subprime* residential mortgage-backed securities. Inexplicably, a similar spreadsheet dated as of September 17, 2007 represented that the Fund's subprime mortgage holdings were around 76.9%.

50.    HPOPS has learned that State Street never intended that the Limited Duration Bond Fund be the well-diversified, conservative, high quality fixed income securities portfolio it was represented to be. Contrary to State Street's representations that the fund would be well-diversified, low-duration, and nonleveraged, State Street mislead HPOPS by intentionally misrepresenting that the Fund would hold only 5.3% in mortgage-backed securities when, in reality, the majority of the Fund's holdings were in *subprime* residential, mortgage-backed securities and derivatives.

51.    Further, HPOPS learned that State Street had highly leveraged the Limited Duration Bond Fund. This was indeed ironic considering that the Limited Duration Bond Fund's stated purpose was to provide daily liquidity for the entirely *unleveraged* Commodities Strategy. State Street never disclosed it would leverage HPOPS' collateral when it marketed the Commodities Strategy. Indeed, it was not until on or about August 13, 2007 that HPOPS learned from a voice mail left by Craig DeGiacomo for Stacy Ables that the Limited Duration Bond Fund actually was leveraged 3.3 times. DeGiacomo refused to confirm this in writing. Thus, State Street had failed to disclose not only that the supposedly conservative, high quality and highly diversified Limited Duration Bond Fund would be comprised primarily of subprime residential mortgage-backed securities, but also that State Street entered into ABX index swaps in order to increase the Fund's subprime mortgage exposure through a leveraged strategy. Indeed, on information and belief, State Street's investment in government holdings in

the Fund was used as further leverage to purchase additional subprime holdings. Because the portfolio was basically fully invested (*i.e.* State Street did not have the cash to purchase US Treasuries), State Street instead entered into interest rate swaps, further leveraging the portfolio, in order to take an additional bet in the portfolio on the direction of interest rates.

## V.    State Street's Self-Dealing: State Street Gave Preferential Treatment to State Street-Related Entities and Refused to Provide Timely, Material Information to HPOPS

52.    When HPOPS learned that State Street had grossly misrepresented its investment strategy and that the Limited Duration Bond Fund was actually undiversified, highly leveraged and primarily invested in subprime residential mortgage-backed securities, it was too late for HPOPS to take any action to protect its remaining collateral. This was due not only to the fact that State Street had continually misrepresented and denied HPOPS access to material information to enable it to discover the truth, but also due to State Street's blatant self dealing in allowing other State Street Funds owning units in the Limited Duration Bond Fund to exchange their units in-kind for what appears to have been the most saleable of the securities owned by the Limited Duration Bond Fund. State Street never communicated to HPOPS that there was a mass exodus from the Fund or that the most desirable of the securities would be sold. Nor did State Street freeze the fund and limit redemptions in order to ensure that all participants would be treated fairly. Importantly, State Street took no actions to protect HPOPS. Only after the fact did HPOPS learn that there had been a mass exodus from the Fund and that it had been left with dramatically devalued holdings.

27

53.     In an email from Megan Gibber of SSgA on or about August 8, 2007 to Pat Franey, State Street disclosed for the first time not only that there were "[c]ertain SSgA commingled funds holding interests in LDBF," but that those SSgA Funds intended to redeem in-kind their respective proportionate interests. Although State Street represented in bold lettering that *"[b]ecause the SSgA Funds are redeeming in-kind a 'perfect slice' of LDBF, the redemption will not negatively affect the liquidity of the assets in the LDBF portfolio*," on information and belief, State Street in fact gave preferential treatment to its own State-Street commingled funds by liquidating the units held by them in a manner that negatively affected the liquidity and quality of the remaining units in the Fund held by HPOPS.

54.     On or about August 27, 2007, Craig DeGiacomo sent a spreadsheet to Pat Franey reflecting the number of units in the Limited Duration Bond Fund from June 29, 2007 through August 27, 2007. The spreadsheet reflects that on August 8, 2007 – the day Megan Gibber disclosed that State Street-commingled funds would be selling their units of the Limited Duration Bond Fund in-kind – there were 44,135,003 units held in the Fund. HPOPS' percentage of ownership then was approximately 10.54%. Two days after the disclosure, on August 10, 2007, the number of units dropped dramatically to 5,278,184 units, thereby increasing HPOPS' ownership of units to 88.133%    On information and belief, of the 44,135,003 units held in the Fund, 38,856,819 were owned by State Street-related parties. On information and belief, State Street allowed these State Street-related parties to get out first and trade its units in-kind for what appears to have been the most saleable securities held by the Limited Duration Bond Fund. State Street thus put its own interests ahead of HPOPS' and thereby breached its fiduciary

duties. HPOPS was never notified that the more desirable securities held in the Fund would be liquidated. Again, it discovered this only after those securities were no longer held in the Fund.

55. Thus, in spite of State Street's representation, its affiliates' redemption of units for in-kind securities in fact did negatively affect HPOPS' liquidity. When State Street redeemed those units, the most saleable assets were distributed – the 2004 and 2005 mortgages that actually had equity. What were left were unsaleable, illiquid odd-lot positions of 2006 and 2007 mortgages with little or no equity. The quality of securities held by the Limited Duration Bond Fund thus dramatically changed. The same spreadsheet that reflects a decrease of 38,856,819 units on August 10, 2007 shows a cumulative decrease in unit value as of August 10, 2007 of negative 23.3%.

56. Further, Paul Greff had represented at the September 11, 2007 meeting with HPOPS that the characteristics of the portfolio were substantially the same both before and after the withdrawals of the other participants from the Fund. This turned out to be far from true. In response to Pat Franey's request for proof of equivalence, State Street sent a bar graph on or about October 4, 2007 which reflected that the distribution of assets as of July 31, 2007, before the August 8 and 9 redemption, was 57.5% in AAA, 35.5% in AA, 5.8% in A and 1.2% in BBB. In contrast, the distribution as of September 17, 2007 was 19.4% AAA, 51% AA, 1.9% AA-, 8.2% A+, 5.9% A, 3.6% A-, and 4.2% BBB. The decrease in quality was not due to downgrades of the securities in the Limited Duration Bond Fund, but rather to State Street's selling off the higher-rated securities and leaving HPOPS with the dregs.

57. Further, as of June 29, 2007, there were approximately 112,947,390 units in the Fund at a unit price of 11.876. By August 24, 2007, there were only 5,278,184 units at a price of 6.547. Thus, just two days after State Street's "disclosure" that it was allowing other parties to redeem their units in-kind, the Limited Duration Bond Fund was a remarkably different and devalued fund with 90% of its holdings gone.

58. Indeed, in an email dated August 28, 2007 from James Thorsen of SSgA to Pat Franey, State Street confirmed that as of August 24, 2007, there were *only 2 participants remaining in the Fund* and that HPOPS' approximate share was $30,507,880 out of a total fund of $34,556,273. HPOPS, whose percentage of ownership in the Fund prior to the State Street-related parties' in-kind redemption had been only 10.54%, became the majority owner of the Fund with 88.133% of the holdings. Franey was further warned that if the market value of the Fund fell below $20 million, the Trustee may close and liquidate the Fund. Because the remaining holdings in the Fund were not saleable, State Street left HPOPS with few options. Moreover, State Street effectively foreclosed HPOPS' ability to protect itself by constantly reversing its position on whether HPOPS could take the assets of the fund in kind or not. In short it was impossible for HPOPS to execute an exit strategy with State Street constantly changing HPOPS' options. Finally, because State Street committed self dealing, it bears the burden of proof to show that the redemption of units in-kind by its own State Street-related funds was not a breach of its fiduciary duties.

59. Compounding the harm was State Street's refusal to timely provide material information to HPOPS when requested, thereby preventing HPOPS from making informed investment decisions. For example, during the August 28, 2007 presentation,

Pat Franey asked what State Street-commingled funds were invested in the Limited
Duration Bond Fund, when they withdrew from the Limited Duration Bond Fund, and
whether their withdrawals harmed HPOPS' liquidity since it was left with odd-lot
positions. Again, on September 12, 2007, Pat Franey of HPOPS asked for information
that would explain why some securities in the portfolio were sold completely while
others were sold down proportionately. State Street refused to answer or provide any
further information in direct violation of their fiduciary obligations of candor and full
disclosure.

   60.   Indeed, from July 2007 to present, HPOPS has requested, without success,
the following information from State Street about its investment:

a.   A daily detail of leverage in the portfolio and an explanation as to why it
     was increased significantly as the market for these securities started to
     deteriorate;

b.   Schedules that detail the characteristics of the portfolio, including, without
     limitation, its market value, listing of securities held, and notional value
     for at least two days a week for the months of July, August, and
     September 2007;

c.   The SSgA Valuation Policy for the portfolio and any changes thereto for
     the last few years;

d.   An updated retracement schedule (from June 30, 2007 to the present) that
     details the gains or losses attributable to HPOPS and not just the loss
     inherent in the remaining positions;

e.   A reconciliation of the retracement schedule to the cash flow schedule;

f.   An analysis on when the ABX Index security was purchased in the Fund
     to support State Street's claim that the security had been held in the Fund
     for the entire year, and not just purchased during the August 2007
     downturn, when the portfolio detail it had provided to HPOPS for March
     through July 2007 showed no such holding;

g.   A reconciliation of the change in cash in the portfolio;

h.     Activity and attribution on the interest rate swaps;

i.     A detail of all redemptions and liquidations after 6/30/07 (no names unless to a party related to State Street), to include dollar amounts, number of units, dates and type (cash or in-kind), whether the distribution was external or to an SSgA fund or other related party, if in-kind, and a detail of the securities transferred;

j.     A review of the CDO activity;

k.     Dates and details of downgrades in the portfolio;

l.     Any and all policy change statements regarding the use of IDC pricing;

m.     A description of how prior in-kind distributions were determined and which securities were selected for distribution;

n.     Analyses of how expenses are accrued and paid in the fund;

o.     An explanation of the analysis used to construct a portfolio that required significant leverage to meet the return objective of cash plus 50bps; and

p.     A P&L statement and a schedule of all activity in the fund for the months of July, August and September 2007.

These requests have been met with resistance and delay tactics.

61.    Indeed, on or about November 7, 2007, HPOPS made a formal request pursuant to Section 10 of the IMA for an audit of HPOPS' collateral investments into the Limited Duration Bond Fund, including specifically these categories of information. Pursuant to that provision, the Trustees requested that their representative be granted access to the books and records related to HPOPS' holdings in the Limited Duration Bond Fund beginning no later than Monday, November 19, 2007. State Street failed to comply in violation of both the plain language of the IMA and the fiduciary duties of candor and full disclosure.

**VI.    Damages:  State Street's Conduct Damaged HPOPS by Tens of Millions of Dollars**

62.    As a direct and proximate result of State Street's blatant self-dealing, breaches of fiduciary duties, fraudulent misrepresentations and non-disclosures, and breaches of contract, HPOPS' investment in the Limited Duration Bond Fund suffered tens of millions of dollars in actual loss.  As of May 31, 2007, the month-end valuation of HPOPS' investment of collateral in the Limited Duration Bond Fund was $56,272,569.26.   By July 31, 2007, the month-end valuation of HPOPS' holdings dropped to $49,165,363.23.  The month-end valuation as of August 31, 2007 fell further to $28,224,565.54.  By December 17, 2007, the value had fallen to $26,381,160.37. HPOPS has suffered tens of millions in damages.

63.    Further, SSgA initially refused to allow HPOPS to redeem its holdings in-kind, as it had allowed its own SSgA-commingled funds.  After representing that HPOPS could take its securities in-kind for some time, State Street claimed on October 5, 2007 that HPOPS in fact could not take securities in-kind.  Again, on October 8, 2007, James Thorsen of SSgA told Pat Franey, Executive Director John Lawson and Stacy Ables that HPOPS could not have a distribution in kind.  When Franey requested that State Street's position be placed in writing, Thorsen refused.  On October 9, 2007, HPOPS had a conference call with State Street during which State Street represented that the only way to do an in-kind distribution would be if either the other participant in the Fund were to receive 100% of the value of its units in cash, or as a second option, HPOPS could transfer its securities into another State Street fund and then take an in-kind distribution for this second fund.  Considering that State Street's own funds had been allowed to have an in-kind distribution, neither option was equitable.   The only option available to

33

HPOPS then was that it liquidate its units holding only odd-lots of subprime residential mortgage-backed securities. This was hardly a viable option given that the President and CEO of SSgA, William W. Hunt, had characterized the saleability of these securities in his October 5, 2007 letter to clients as a "largely illiquid market creating realized losses." Indeed, in the call on October 9, 2007, Marc Brown of State Street acknowledged to Franey, Ables and Lawson that HPOPS had been disadvantaged by remaining in the Limited Duration Bond Fund after other participants, including other State Street-commingled funds, had redeemed their units in-kind. State Street could not, as it had previously promised, give HPOPS its perfect slice of the Limited Duration Bond Fund.

64.    On November 13, 2007, HPOPS sent a letter to State Street terminating them and requesting that they liquidate the Limited Duration Bond Fund and return HPOPS' proceeds to it, but not until they had discussed with HPOPS the mechanics and timing of such liquidation. Craig DeGiacomo told Pat Franey that State Street would send HPOPS a letter notifying it that the Limited Duration Bond Fund would be liquidated and then follow up with another letter describing the liquidation process.

65.    On November 26, 2007, HPOPS received the letter stating that the Fund would be closed and notifying HPOPS that its relationship manager would be contacting HPOPS to discuss the liquidation process.

66.    On December 4, 2007, DeGiacomo called and said that it would be possible for HPOPS to take its share of the Fund in-kind and asked if HPOPS wanted to pursue this. HPOPS agreed to the arrangement.

67.    On December 11, 2007, HPOPS received a letter from State Street stating that HPOPS had until December 21, 2007 to elect to take an in-kind distribution from the Limited Duration Bond Fund.

68.    On December 13, 2007, HPOPS had a conference call with Bob Pickett, Dominic Janson, Mark Hoeful, Charles Coheny, and DeGiacomo of State Street. They told HPOPS that, in spite of HPOPS' request to be informed of the liquidation procedure for the Fund, they in fact had been liquidating the portfolio since the beginning of December and would continue to do so.   HPOPS sent State Street a letter asking for a distribution in-kind shortly after this call.

69.    On December 17, 2007, HPOPS received $14,270,970 in cash plus securities valued at $13,315,199. Thus, by December 17, 2007, as a direct and proximate result of State Street's misconduct and omissions, HPOPS had suffered tens of millions in damages.    HPOPS will realize additional actual damages upon liquidation of the remaining securities. Those securities have permanently declined in value.

70.    Finally, State Street must disgorge the fees it was paid by HPOPS while in breach of its fiduciary duties to HPOPS. The following is a schedule of fees paid:

| Qtr Ended | Amount |
|-----------|--------|
| 9/30/2007 | $ 37,500.00 |
| 6/30/2007 | 45,043.63 |
| 3/31/2007 | 37,500.00 |
| 12/31/2007 | 22,688.89 |
| 9/30/2006 | 10,968.15 |

Thus, in addition to this and other damages to be calculated prior to trial, State Street must disgorge fees in the amount of at least $153,700.67 to HPOPS.

## CAUSES OF ACTION

### Cause of Action I: Breach of Fiduciary Duty (Against SSgA and SSB)

71.     HPOPS incorporates the allegations set forth in paragraphs 1 to 70 as if fully set forth herein.

72.     SSgA was HPOPS' fiduciary under both law and contract. As HPOPS' investment manager with full discretion to make investment decisions for the benefit of HPOPS, SSgA owed HPOPS the highest fiduciary duties to exercise fidelity in good faith on its behalf. Further, under the Amended IMA, SSgA explicitly agreed and acknowledged that it would be acting as a fiduciary to HPOPS and would be subject to the "prudent expert" rule with regard to SSgA's investments related to the Commodities Strategy, including the investment of its cash collateral account.

73.     By making unjustified investments of all of the cash collateral held by State Street into the Limited Duration Bond Fund, a leveraged, high-risk, long-duration fund with no real diversification beyond the subprime residential mortgage market, SSgA breached its fiduciary duties to HPOPS. Indeed, no prudent expert who understood HPOPS' investment needs and criteria would have made such an investment.

74.     In addition, SSgA was also the investment manager for the Limited Duration Bond Fund. As such, SSgA owed HPOPS, a beneficiary of the fund, fiduciary duties with respect to the investments made by the Limited Duration Bond Fund. Once again, SSgA violated its fiduciary responsibilities, as more particularly described above, by improperly investing the bond fund's assets into a single industry sector, with

substantial leverage and with long-term duration. These characteristics were not in accordance with the stated purposes or objectives of the Limited Duration Bond Fund.

75.     SSB, as trustee, custodian and record-keeper of the Limited Duration Bond Fund and with "exclusive management and control of the Trust," owed HPOPS, an owner of units of the Limited Duration Bond Fund and therefore a beneficiary of the Limited Duration Bond Fund and/or Trust, specific fiduciary duties imposed by law and the contract. These fiduciary duties include, without limitation, the duty of good faith, fair dealing, loyalty, and fidelity over the trust's affairs and its principal; the duty to make the assets of the trust productive while preserving the assets; the duty to disclose all material facts known to the trustee that might affect the beneficiaries' rights; the duty to account for all trust transactions; the duty to properly manage, supervise and safeguard trust funds; the duty to refrain from self-dealing with trust assets; and the duty to refrain from lending trust funds to itself or an affiliate. As set forth herein, SSB breached these and other fiduciary duties owed to HPOPS.

76.     Further, both SSgA and SSB owed HPOPS the general, common-law fiduciary duties of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing or dealing with other entities whose interests are closely identified with those of the fiduciary, the duty to act with integrity of the strictest kind, the duty of fair and honest dealing, and the duty of full disclosure and to not conceal matters that might influence a fiduciary to act in a manner prejudicial to its principal. As set forth herein, SSgA and SSB also breached these and other fiduciary duties owed to HPOPS.

77.     The fiduciary relationship forbids conduct on the part of SSgA and SSB which is fraudulent or adverse to HPOPS' interests and imposes on both SSgA and SSB a

positive duty to communicate all information they may possess or acquire which is material to HPOPS' advantage.

78. SSB and SSgA breached the fiduciary duties they owed to HPOPS in at least the following ways:

(a) By misrepresenting that the Limited Duration Bond Fund was a short-term cash vehicle comprised of high quality and well-diversified fixed income securities when in reality it consisted of up to 94% of subprime, residential mortgage-backed securities and the ABX Index;

(b) By misrepresenting that the Limited Duration Bond Fund would be a suitable investment for HPOPS' cash collateral for investment in the Limited Duration Bond Fund when its holdings were highly leveraged and concentrated in the subprime mortgage market;

(c) By misrepresenting that the Limited Duration Bond Fund would provide for daily liquidity for State Street's commodities futures strategy when its holdings were unsaleable, illiquid odd-lots of subprime, residential mortgage-backed securities and when State Street's own "prospectus" (which was not provided to HPOPS until on or about July 23, 2007) itself provided that the Limited Duration Bond Fund "should not be used for daily liquidity";

(d) By misrepresenting the Limited Duration Bond Fund's objective as conservative in seeking to match or exceed the returns of the JP Morgan one-month US Dollar LIBOR Index by a mere 50 basis points when investing primarily in subprime, residential mortgage-backed securities was core to its strategy;

(e) By failing to disclose that the Limited Duration Bond Fund would itself be highly leveraged;

(f) By failing to disclose that the Limited Duration Bond Fund would invest in speculative, subprime, residential mortgage-backed securities and derivatives, including the ABX Index;

(g) By investing in the Limited Duration Bond Fund, by allowing the Limited Duration Bond Fund to make investments, and by failing to disclose that the Limited Duration Bond Fund would consist of, primarily (and by as much as 94%) subprime, residential mortgage-backed securities;

(h) By self-dealing in giving preferential treatment to State Street-related entities and SSgA-commingled funds by allowing them to redeem their units in the Limited Duration Bond Fund in-kind ahead of HPOPS and for the most saleable of the Fund's holdings, thereby undermining the liquidity and quality of HPOPS' holdings;

(i) By representing that the in-kind redemption of units in the Limited Duration Bond Fund by SSgA-related entities would not negatively affect the liquidity and quality of HPOPS' holdings and by failing to disclose that there would be a mass exodus from the Fund and that the most desirable of the securities would be sold off;

(j) By failing to timely disclose material information regarding the true nature of the investments in the Limited Duration Bond Fund and the Limited Duration Bond Fund's actual investment strategy and holdings, preventing HPOPS from taking any actions to protect its assets;

(k) By refusing to allow HPOPS to redeem all of its units in-kind in a manner equal to what it had allowed its own State Street-related entities to do or to otherwise provide for equitable treatment of all participants in the Fund; and

(l) By violating the fiduciary duties of full disclosure and candor regarding HPOPS' investment of cash collateral in the Limited Duration Bond Fund.

79.    Upon information and belief, SSgA and SSB committed self-dealing by giving preferential treatment to other State Street-related entities, including other State Street-commingled funds that owned up to 38,856,819 units of the Limited Duration Bond Fund, by allowing them to get out in front of HPOPS and redeem their units in-kind for what appears to have been the most saleable of the securities held in the Fund; *i.e.* the 2004 and 2005 mortgage securities that actually held equity. HPOPS was left with 88% of the ownership of units in the Fund that consisted of illiquid odd-lot positions in subprime residential mortgage securities with little or no equity.   State Street thus benefited at HPOPS' expense. Because SSgA and SSB entered into transactions with other State Street-related entities, there is an equitable presumption that these transactions were unfair and inequitable to HPOPS. Both the burden of persuasion and the burden of

producing evidence therefore fall on SSgA and SSB to prove that these transactions were fair, equitable, and do not constitute a breach of fiduciary duty.

80.    SSgA and SSB's breaches of fiduciary duty were intentional and committed in bad faith.

81.    As a direct and proximate result of SSgA and SSB's breaches of fiduciary duties to HPOPS, HPOPS has been injured by tens of millions of dollars and State Street has received inequitable benefits at HPOPS' expense.    HPOPS seeks all actual, consequential, incidental, and exemplary damages from State Street as may be allowed by law.    Further, HPOPS seeks a constructive trust on all proceeds, funds, or property obtained by State Street as a result of its breaches of fiduciary duties.    HPOPS also pleads that State Street cannot retain any benefits it acquired while in breach of its fiduciary duties to HPOPS and thus requests that State Street be required to forfeit any fees it collected as a result of the breach.

## Cause of Action II: Breach of Contract (Against SSgA)

82.    HPOPS incorporates the allegations set forth in paragraphs 1 to 81 as if fully set forth herein.

83.    SSgA and HPOPS entered into an Investment Management Agreement, as amended on or about June 16, 2006 ("the Amended IMA").    Under the Amended IMA, SSgA agreed to act as investment manager with sole investment discretion for the benefit of HPOPS and explicitly agreed and acknowledged that it would be acting as a fiduciary to HPOPS.    HPOPS fully performed its obligations under the Amended IMA, and all conditions precedent to HPOPS' claims for relief have been performed or have occurred.

84.    SSgA materially breached these contractual obligations to HPOPS by, among other things:

(a) violating the fiduciary obligations SSgA agreed to be bound by;

(b) investing HPOPS' $54,298,176.00 of collateral in a Limited Duration Bond Fund that would be comprised primarily of subprime residential mortgage-backed securities in violation of its obligation to exercise the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with matters of the same type would use in the conduct of an enterprise with a like character and with like aims." IMA at § 5.c;

(c) failing to disclose the true nature of HPOPS' investment in the Limited Duration Bond Fund in violation of its agreement to exercise the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with matters of the same type would use in the conduct of an enterprise with a like character and with like aims." IMA at § 5.c;

(d) failing to "use reasonable care in good faith to transact business in the most efficient manner utilizing the best stock, bond and currency executions" by selecting the Limited Duration Bond Fund as the short term cash vehicle for the commodities futures strategy;

(e) failing to "use reasonable care in good faith to maintain and achieve the Objectives of the Account Assets . . .." by investing the collateral in a Limited Duration Bond Fund that was not diversified, highly leveraged and would fail to provide needed liquidity (*Id.* at § 5.f);

(f) upon information and belief, by failing to disclose self-dealing in violation of its agreement to disclose in a signed document to the Board any decision "being made concerning any investment, benefit or other action in which the fiduciary has an interest" by allowing other State Street-related entities to redeem their units in kind for the most saleable of the holdings to HPOPS' detriment;

(g) violating the Investment Policy of HPOPS requiring that SSgA invest "[n]o more than 25% of the portfolio at market value [ ] in any one single industry sector," that a fixed income portfolio on a weighted value basis shall be A-rated or higher, and that no investment would be rated less than investment grade; and

(h) refusing to provide timely material information requested by HPOPS as obligated to do under the IMA.

85.    As a direct and proximate result of SSgA's breach of contract, HPOPS has been injured by tens of millions of dollars.  HPOPS seeks all actual, consequential, incidental, and exemplary damages from SSgA as may be allowed by law.  HPOPS also seeks reasonable attorney's fees and expenses under Texas Civil Practices & Remedies Code section 38.001 and the contract.

### Cause of Action III:  Common Law Fraud – Fraudulent Misrepresentation and Fraudulent Inducement (Against SSgA and SSB)

86.    HPOPS incorporates the allegations set forth in paragraphs 1 to 85 as if fully set forth herein.

87.    State Street committed fraud against HPOPS by making numerous fraudulent misrepresentations that the investment of HPOPS' cash collateral in the Limited Duration Bond Fund would be in a high-quality, well-diversified fixed income securities allocation that would provide for daily liquidity and would not be leveraged, with a conservative objective to match or exceed the JP Morgan one-month US Dollar LIBOR Index by a mere 50 basis points.   State Street, through its agents and representatives, made the following material misrepresentations to HPOPS, including, without limitation:

(a) representing in the initial August 2005 presentation that residual cash invested in the commodities futures strategy would be placed in "*high quality* money market securities or pooled funds," that the investment would "provide for *daily liquidity*," that the Limited Duration Bond Fund would be invested in securities with an "average quality of AAA" with only 1.8% in BBB; and that *only 5.3%* of the Limited Duration Bond Fund's holdings would be invested in *mortgage-backed securities*;

(b) representing through its agent Craig DeGiacomo on or about May 11, 2007 that HPOPS could liquidate its investment in the Limited Duration Bond Fund with one day's notice;

(c) representing in its "prospectus" for the Limited Duration Bond Fund dated June 30, 2007 that the Limited Duration Bond Fund's objective was "to maximize income while preserving capital by investing in *diversified portfolio of highly rated fixed income securities*" and to "match or exceed one-month US Dollar LIBOR index over trailing one-year periods," and that the Fund would utilize "an *expanded universe of securities;*"

(d) representing in its Amended Fund Declaration, dated October 1, 2005, and sent to HPOPS in July 2007, that the Fund would be *well-diversified* in several types of fixed income securities;

(e) representing in both its August 28, 2007 and September 11, 2007 Power Point presentations that the Limited Duration Bond Fund, as of July 31, 2007, held only 15.35% in mortgage-backed securities; and

(f) representing through its agent Megan Gibber in an August 8, 2007 email that SSgA-commingled funds' redemption of units in the Limited Duration Bond Fund for in-kind securities would not negatively affect HPOPS' liquidity.

88.     These representations were false and State Street knew that they were false when made or made them recklessly without knowledge of their truth. HPOPS later discovered that the Limited Duration Bond Fund was not invested in high-quality, well-diversified fixed income securities to meet a conservative objective of 50 basis points over cash (a mere .050%), but rather was imprudently and unsuitably invested 80% - 90% in subprime, residential mortgage-backed securities and derivatives.

89.     State Street's representation that the Limited Duration Bond Fund, which was intended to be a short-term cash vehicle for an entirely unleveraged commodities account, would itself not be leveraged also was false. In August 2007, Stacy Ables learned through a voicemail left by Craig DeGiacomo that the Fund was leveraged up to approximately three times.

90.     Further, State Street's representations that the Limited Duration Bond Fund would be invested in high-quality, investment-grade securities was also false. The

43

Fund's long position on the BBB ABX Index, an investment in derivative instruments backed by subprime mortgages, was rated below investment grade.

91.     Finally, contrary to its representations, State Street's affiliates' redemption of units for in-kind securities did in fact harm HPOPS' liquidity and the quality of their holdings. On information and belief, State Street gave to its own affiliates those securities that were most saleable and that had equity, thereby leaving HPOPS only odd-lots of much less saleable securities.

92.     State Street made these material representations with the intention that HPOPS rely upon them. Indeed, State Street's August 2005 presentation was made specifically to induce HPOPS to select State Street as the investment manager for its commodities futures strategy. HPOPS in fact did justifiably rely on these material representations to its detriment in not only initially electing to invest money in State Street's Commodities Strategy, but also remaining in the strategy and allowing State Street to continue to have sole discretion over its investment. HPOPS would not have granted SSgA discretion to invest its $54,298,176.00 of cash collateral required to fund its Commodities Strategy had it known that State Street would not invest it in a high-quality, well-diversified fixed income allocation providing for daily liquidity, but rather would put almost every penny in the residential mortgages market, most in the subprime market, and do so with leverage.

93.     As a direct and proximate result of State Street's fraudulent misrepresentations, HPOPS has been injured by tens of millions of dollars. In connection with this claim, HPOPS seeks all actual, consequential, incidental, and exemplary damages as allowed by law.

**Cause of Action IV : Common Law Fraud – Fraud by Non-Disclosure (Against SSgA and SSB)**

94.     HPOPS incorporates the allegations set forth in paragraphs 1 to 93 as if fully set forth herein.

95.     As a fiduciary, State Street had a duty to fully and truthfully disclose all material facts regarding HPOPS' investments with State Street to HPOPS.

96.     By failing to disclose that the Limited Duration Bond Fund would not be invested in a high-quality, well-diversified fixed income securities allocation that would provide for daily liquidity, but instead would be comprised primarily of investments in the subprime residential mortgage market, State Street committed fraud against HPOPS by such non-disclosure. State Street concealed from and failed to disclose material facts to HPOPS regarding its investment of cash collateral in the Limited Duration Bond Fund, to include, without limitation:

(a) Failing to disclose that the Limited Duration Bond Fund consisted of up to 94% of subprime, residential mortgage-backed securities, instead allowing HPOPS to believe that the Limited Duration Bond Fund was a short-term cash vehicle comprised of high quality and well-diversified fixed income securities;

(b) Failing to disclose that the Limited Duration Bond Fund's holdings were concentrated in the subprime mortgage market, instead allowing HPOPS to believe that the Limited Duration Bond Fund would be a suitable investment for its cash collateral;

(c) Failing to disclose that the holdings were unsaleable, illiquid odd-lot positions and that State Street's own "prospectus" for the Fund (which was not provided to HPOPS until on or about July 23, 2007) itself provided that the Limited Duration Bond Fund "should not be used for daily liquidity," instead allowing HPOPS to believe that the Limited Duration Bond Fund would provide for daily liquidity for State Street's commodities futures strategy;

(d) Failing to disclose that core to the Limited Duration Bond Fund's strategy was to invest primarily in the subprime residential mortgage

market, instead allowing HPOPS to believe that the Limited Duration Bond Fund's objective was conservative, seeking only to match or exceed the returns of the JP Morgan one-month US Dollar LIBOR Index by a mere 50 basis points;

(e) Failing to disclose that the Limited Duration Bond Fund would itself be highly leveraged;

(f) Failing to disclose that the Limited Duration Bond Fund would invest in speculative subprime residential mortgage-backed securities and the ABX Index, instead allowing HPOPS to believe all investments would be high quality and rated investment grade;

(g) Failing to disclose that the Limited Duration Bond Fund would consist of, primarily (and by as much as 94%) subprime, residential mortgage-backed securities;

(h) Upon information and belief, failing to disclose that allowing State Street-related entities that owned units in the Limited Duration Bond Fund to redeem their units in-kind ahead of HPOPS would materially undermine the liquidity and quality of HPOPS' holdings;

(i) Failing to disclose that there might be or that there was a mass exodus from the Fund and that the most desirable of the securities held in the Fund would be sold off; and

(j) Failing to timely disclose, and/or refusing to disclose, material information regarding the true nature of the investments in the Limited Duration Bond Fund and the Limited Duration Bond Fund's actual investment strategy and holdings as requested by HPOPS.

97.     Each of the facts that State Street failed or refused to disclose were material in that HPOPS would not have allowed its cash collateral for the commodities futures strategy to be invested in the Limited Duration Bond Fund had it known the truth about State Street's actual investment strategy for the Fund and the Fund's actual holdings.  Likewise, a reasonable person would attach importance to each of these facts and would be induced to act on the information in determining whether to invest in the Commodities Strategy, or remain invested in the strategy, had he or she known that the

collateral would be invested in a Limited Duration Bond Fund consisting almost exclusively of subprime, residential mortgage-backed securities and derivatives.

98.     By failing to disclose the facts, State Street intended to induce HPOPS to invest in the Commodities Strategy with its collateral in the Limited Duration Bond Fund and to keep HPOPS in the fund.

99.     HPOPS relied on State Street's nondisclosures to its detriment by not only initially electing to invest money in State Street's Commodities Strategy, but also remaining in the strategy and allowing State Street to continue to have sole discretion over its investment.  HPOPS would not have granted State Street sole discretion to invest its $54,298,176.00 of cash collateral required to fund its Commodities Strategy had it known that State Street would not invest it in a high-quality, well-diversified fixed income allocation providing for daily liquidity, but rather would put almost every penny in the subprime residential mortgages market and do so on margin.

100.    As a direct and proximate result of State Street's fraudulent nondisclosures and omissions, HPOPS has been injured by tens of millions of dollars.  In connection with this claim, HPOPS seeks all actual, consequential, incidental, and exemplary damages as allowed by law.

## Cause of Action V – Negligent & Grossly Negligent Misrepresentation (Against SSgA and SSB)

101.    HPOPS incorporates the allegations set forth in paragraphs 1 to 100 as if fully set forth herein.

102.    As stated above, State Street owed HPOPS a duty as a fiduciary to exercise fidelity in good faith on its behalf.  State Street also owed HPOPS the duty to exercise reasonable care in handling its portfolio account and to reasonably and fully

47

disclose to HPOPS the actual nature of its investments. By investing HPOPS' funds, without its knowledge or authorization, in a portfolio that was not adequately diversified but instead was invested almost exclusively in high risk, subprime mortgage-backed securities, State Street has breached those duties and such breach has proximately resulted in harm to HPOPS. Thus, State Street is liable to HPOPS for negligence. Further, because the breach involved an extreme degree of risk, of which State Street had actual awareness but proceeded nonetheless in conscious indifference to HPOPS' rights, State Street is also liable to HPOPS for gross negligence.

103. As a direct and proximate result of SSgA's and SSB's negligence and gross negligence, HPOPS has been injured by tens of millions of dollars. In connection with this claim, HPOPS seeks all actual, consequential, incidental, and exemplary damages as allowed by law.

**Cause of Action VI - Violations of the Texas Securities Act (Against SSgA and SSB)**

104. HPOPS incorporates the allegations set forth in paragraphs 1 to 103 as if fully set forth herein.

105. State Street also committed violations of the Texas securities laws by trading securities for HPOPS without disclosing to it the material facts regarding the transactions. Specifically, State Street invested HPOPS' funds in a cash collateral account primarily holding leveraged, subprime, residential mortgage-backed securities and derivatives without its knowledge or authorization. In so doing, State Street engaged in the sale of securities by means of either untrue statements or omissions of material facts which are necessary in order to make the statements made, in light of all circumstances, not misleading.

106.    Specifically, SSB, as the trustee of the Limited Duration Bond Fund that issued units of the Limited Duration Bond Fund to HPOPS, is liable to HPOPS as a seller under article 581-33 of the Act.   The units of the Limited Duration Bond Fund sold to HPOPS qualify as securities under article 581-4(A) of the TSA.   SSB offered or sold the units of the Limited Duration Bond Fund to HPOPS, as an investment for HPOPS' collateral under the Commodities Strategy, by means of untrue statements and/or omissions of material facts necessary to make the statements made not misleading in that SSB represented the Limited Duration Bond Fund to be a short-term cash vehicle, providing for liquidity, and invested in well-diversified, highly-rated fixed income securities, when in reality it was invested almost entirely in highly leveraged, subprime residential mortgage-backed securities.

107.    SSgA is jointly and severally liable under article 581-33 as a person who directly or indirectly with an intent to deceive or defraud or with reckless disregard for the truth, materially aided SSB in its sale of the units of the Limited Duration Bond Fund by means of an untruth or omission.

108.    As damages for violations of the Texas Securities Act under article 581-33, HPOPS is entitled to recover all consideration paid for the units of the Limited Duration Bond Fund plus interest thereon at the legal rate from the date of payment less the value of the units at the time HPOPS disposed of them, equaling tens of millions of dollars.

109.    In addition, SSgA is an investment adviser as defined by Tex. Rev. Civ. Stat. Ann. art. 581-4(N).   Pursuant to Tex. Rev. Civ. Stat. Ann. art. 581-33-1, SSgA committed fraud and/or engaged in a fraudulent practice in rendering services as an

49

investment advisor in investing HPOPS' collateral in the Limited Duration Bond Fund by representing it to be a short-term cash vehicle, providing for liquidity, and invested in well-diversified, highly-rated fixed income securities, when in reality it was invested almost entirely in high risk, leveraged, subprime residential mortgage-backed securities.

110.    SSB is jointly and severally liable as a person who directly or indirectly with an intent to deceive or defraud or with reckless disregard for the truth, materially aided SSgA as investment adviser.

111.    As damages for violations of the Texas Securities Act under article 581-33-1, HPOPS is entitled to recover all consideration paid to SSgA for its investment services, losses incurred in acting on the services totaling tens of millions of dollars, and interest at the legal rate. In connection with this claim, HPOPS seeks all actual, consequential, incidental, and exemplary damages as allowed by law.

112.    HPOPS pleads no federal cause of action whatsoever, notwithstanding any allegation set forth in this complaint that might suggest otherwise.

## Cause of Action VII – Conspiracy (Against SSgA and SSB)

113.    HPOPS incorporates the allegations set forth in paragraphs 1 to 112 as if fully set forth herein.

114.    Defendants SSgA and SSB conspired with one another to defraud HPOPS by falsely representing to HPOPS that its investment of $54,298,176.00 of cash collateral in the Limited Duration Bond Fund would be placed in a high quality, well-diversified, fixed income securities allocation with a conservative objective to match or exceed the JP Morgan one month U-S Dollar LIBOR Index by a mere 50 bps and would provide for daily liquidity to enable HPOPS to meet any margin calls from commodities swaps.

Defendants failed to disclose that, in reality, the Limited Duration Bond Fund would be invested primarily in the subprime residential mortgage market, would be highly leveraged, and would not provide daily liquidity as needed to support the Commodities Strategy.

115.    Defendants SSB and SSgA each agreed that they would induce HPOPS to invest in the Commodities Strategy by falsely representing that the collateral HPOPS would have to provide would be safely invested in a slightly enhanced short-term cash vehicle – the Limited Duration Bond Fund, which they represented would be well-diversified in highly rated fixed income securities and would further provide for daily liquidity to meet any margin calls in the Commodities Strategy.  Defendants, however, intended only to induce HPOPS to provide the capital to allow State Street to purchase more subprime, residential mortgage backed securities and derivatives in the Limited Duration Bond Fund – and to not disclose to HPOPS the true make-up of that Fund. Defendants accomplished that end by making numerous fraudulent misrepresentations and non-disclosures, breaches of fiduciary duty, breaches of contract, violations of the Texas Securities Laws, among other overt acts and omissions.

116.    As a direct and proximate result of the conspiracy, HPOPS has been injured by tens of millions of dollars. In connection with this claim, HPOPS seeks all actual, consequential, incidental, and exemplary damages as allowed by law.

## Damages

117.    As a proximate result of the actions and omissions of State Street, HPOPS has suffered damages. The value of HPOPS' commodities account dropped by tens of millions of dollars as a result of State Street's conduct. HPOPS is also entitled to

attorney's fees under Chapter 38 of the Texas Civil Practices and Remedies Code, costs and expenses, punitive damages, and pre- and post-judgment interest as allowed by law. HPOPS is entitled to exemplary and punitive damages as a result of State Street's malicious and intentional conduct and gross negligence. All damages are sought jointly and severally against SSB and SSgA.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, HPOPS prays that State Street Bank and State Street Global Advisors, Inc. be cited to answer and appear and that HPOPS have judgment against them as follows:

(i)     for actual damages resulting from breach of fiduciary duty, breach of contract, common law fraud, fraudulent inducement, fraud by non-disclosure, statutory fraud, negligence, gross negligence, violations of the Texas securities laws, and conspiracy;

(ii)    for reasonable and necessary attorney's fees;

(iii)   for pre- and post-judgment interest at the maximum lawful rate;

(iv)    for expenses and costs;

(v)     for exemplary and punitive damages as a result of the malicious and intentional fraud, breaches of fiduciary duty, and gross negligence; and

(vi)    for such other and further relief to which HPOPS may show itself entitled.

Respectfully submitted,

/s/ Robert R. Burford

By:_____

       Robert R. Burford
       State Bar No. 03371700
       GIBBS & BRUNS, L.L.P.
       1100 Louisiana, Suite 5300
       Houston, Texas 77002
       (713) 650-8805 – Telephone
       (713) 750-0903 - Facsimile
       **ATTORNEY-IN-CHARGE FOR**
       **PLAINTIFF**

**OF COUNSEL:**
Caren S. Sweetland
State Bar No. 24001333
GIBBS & BRUNS, L.L.P.
1100 Louisiana, Suite 5300
Houston, Texas 77002
(713) 650-8805 – Telephone
(713) 750-0903 - Facsimile